PER CURIAM.
This controversy involves the validity of an agreement for rescission of certain “key man” life insurance policies. Employee Fringe Benefits (Employee), owner and beneficiary of the rescinded policies, sued Great Southern Life Insurance Company (Great Southern) for recovery on the policies. Great Southern defended on the grounds that the policies had been rescinded by agreement between it and Employee, for a valuable consideration, that all claims under the policies had been satisfied by payment, and that Employee had released Great Southern from all further liability on the policies. Great Southern and Employee both urged in the trial court that the controversy was ripe for determination on motion for summary judgment. Accordingly, the trial court rejected Great Southern’s defenses and granted summary judgment in favor of Employee for recovery of the full face amount of the policies, based upon the court’s determination that the rescission agreement was voidable for mutual mistake of fact. We affirm the trial court’s decision.
Ronald B. Garelick, Forrest Jefferson Harris, Jr., and Gary Holmes became associated together in a land development project through a corporation known as Hidden Hills North Development Company, which was wholly owned by Garelick. Garelick’s contribution to the project consisted of a loan of $70,000.00 to the corporation, which was borrowed from The State Exchange Bank in Lake City. Garelick obtained key man insurance from Great Southern covering the lives of the principals in the corporation in the following amounts: a $400,-000.00 and a $100,000.00 policy on the life of Harris; a $200,000.00 policy on the life of Holmes; and a $100,000.00 policy on Garel-ick. Hidden Hills was the original owner and beneficiary of all the policies; but this was later changed by assignment of all the policies to Employee Fringe Benefits, appel-lee herein, which was an insurance agency owned by Garelick.
On April 23, 1977, Harris was reported as missing, and an investigation into his disappearance was commenced by law enforcement agencies, including the FBI. On July 7, 1977, Great Southern learned that Harris was missing. Great Southern’s claims manager contacted Garelick noting that the incontestability period for the Harris policies might run as early as August 8, 1977, and that Great Southern might have to file an action against Employee contesting the policies before that time. Garelick agreed to travel to Houston to discuss the policies with officers of Great Southern.[1]
Garelick and his representatives met with Great Southern representatives in Houston on August 1 and 2, 1977. On August 2, 1977, Employee, through its president, Gar-elick, and Great Southern entered into an agreement under which the policies on the life of Harris were rescinded. Employee was paid $26,147.00 for the rescission of the Harris policies. The agreement, which was drafted by Great Southern, contains no reference to the possibility that Harris might have been dead on that date, and contains no language from which it can be inferred that Employee intended to release Great Southern from accrued liability on the policies if, in fact, it later developed that Harris was in fact dead. On August 3, 1977, Harris’ body was found. The parties stipulated that Harris was indeed dead prior to the time the rescission agreement was executed. By a strange quirk of fate, on August 4, 1977, Garelick, while piloting his own aircraft, crashed, sustaining injuries which resulted in his death on August 5, 1977.
The trial judge found that the agreement for rescission of the Harris policies was entitled to be avoided by Employee on the *409 ground of mutual mistake of fact, based upon the undisputed facts showing that at the time the rescission agreement was executed, neither party knew that Harris was already dead and that the contingent liability - of Great Southern to pay the face amount of the policies was no longer contingent, but had become absolute. We conclude that the trial judge ruled correctly.
In support of the trial judge’s decision, appellee refers to the basic rule that in order for an agreement to rescind or cancel an insurance policy to have binding effect, each party must act with knowledge of the material facts. See, 17 Couch on Insurance 2d, § 67:205, at 520. Appellee further refers us to a number of cases from other jurisdictions holding that a beneficiary who has surrendered interests under an insurance policy in ignorance of material facts has the right to avoid the contract relieving the insurer of accrued liabilities on the policy. These cases are: Gavin v. North Carolina Mutual Insurance Co., 265 S.C. 206, 217 S.E.2d 591 (1975); Traders’ Insurance Co. v. Aachen & Munich Fire Insurance Co., 150 Cal. 370, 89 P. 109 (1907); Board of Trustees of the Unitarian Church v. Nationwide Life Insurance Co., 88 N.J.Super. 136, 211 A.2d 204 (1965); Seidman v. New York Life Insurance Co., 162 Misc. 560, 296 N.Y.S. 55 (Sup.Ct.1937), affirmed without opinion, 253 App.Div. 804, 2 N.Y.S.2d 634, aff’d, 279 N.Y. 620, 17 N.E.2d 680 (1938); Riegel v. American Life Insurance Co., 153 Pa. 134, 25 A. 1070 (1893); and Boyd v. Aetna Life Insurance Co., 310 Ill.App. 547, 35 N.E.2d 99 (1941). Although only two of these cases, i.e., Board of Trustees and Riegel, involve the prior death of the insured as the unknown material fact, as we read them all stand for the proposition that an insurer cannot avoid liability on a policy when the owner or beneficiary has been led to accept less than amounts already accrued under the terms and conditions of the policy, while ignorant of facts which would give rise to full recovery under the policy.
The court in Traders’ rejected the insured’s argument that the cancellation agreement was binding because it released and surrendered all liability, past as well as future, and also rejected the argument that the insured party should not be entitled to avoid the release or cancellation of liability because of knowledge that a loss “might have occurred.” On the latter point, the court said:
We see no reason why the intent to surrender an accrued claim, the existence of which was not known, should be imputed to the plaintiff in the absence of an express understanding to that effect; and there is nothing here to evidence such understanding. 89 P. at 111.
Great Southern’s arguments in similar vein here were also properly rejected by the trial court.
Great Southern makes much of facts which, it urges, show that the parties contemplated the death of Harris as one of the material alternative factual circumstances governing their mutual determination to proceed with the cancellation of the policies. Great Southern relies on the principle that mistakes which the contracting parties had in mind as possibilities, and as to the existence of which they took the risk, cannot be the basis for avoiding a transaction. 13 Williston on Contracts, § 1543, p. 75; 3 Pomeroy, Equity Jurisprudence, 5th Ed., § 855; Restatement of the Law of Restitution, § 11. Great Southern also relies upon Sears v. Grand Lodge A.O.U.W. of New York, 163 N.Y. 374, 57 N.E. 618 (1900), and Kowalke v. Milwaukee Electric Railway & Light Co., 103 Wis. 472, 79 N.W. 762 (1899). In our view the facts of the case before us can be more closely analogized to the cases cited by Employee, rather than the Sears and Kowalke cases.
As to the argument that Employee’s knowledge of the fact that Harris’ prior death was one of the possibilities, we think the answer to this contention was given by the court in Traders’, as previously noted. There are, of course, circumstances under which the rule relied upon by Great Southern would be applicable. We do not find that to be the case here, however. Even if we assumed that the evidence referred to by Great Southern would be sufficient to *410 give rise to factual inferences supporting Great Southern’s defense on this theory, we do not find that the existence of such factual inferences would compel a different result in this case.[2] We think that the inferences are equally as strong, if not stronger, that both parties regarded the policies as executory contracts involving promises to pay on conditions not yet fulfilled.[3] Appel-lee-Employee appropriately points out that there was no discussion to the effect that Employee knowingly assumed the risk of Harris’ death at the time it executed the rescission of the policies, and further, the agreement, which was prepared by Great Southern, is totally silent concerning the parties contemplation of such a possibility. Under these circumstances the mere possibility that the parties might have subjectively, at some time subsequent to Harris’ disappearance, reflected on or expressed the possibility that he might be dead does not compel a finding that the rescission agreement later executed was predicated on such a possibility, nor that the parties mutually intended that Employee would forego any accrued claims that might already have arisen by reason of his death.
We find no merit in Great Southern’s argument that a different result than the one reached by the trial judge is required because a rescission of the policies, unlike a cancellation, voids the policies ab initio. We find it makes no difference here, because the mutual mistake was sufficient to avoid the agreement, regardless of whether it should be viewed a cancellation, or a rescission ab initio.
Finally, since the claims of appellee-The State Exchange Bank have not been ruled upon by the trial judge, no issues with. respect to its claims are presented for our consideration.
The judgment appealed from is AFFIRMED.
McCORD, LARRY G. SMITH and WENTWORTH, JJ., concur.

. A Jacksonville newspaper published an article on the disappearance of Harris which focused on his possible knowledge of mob activities, his fear that his life was in danger for that reason, and various details concerning investigations by law enforcement authorities.

. Great Southern notes in this connection that Harris had been missing for three and one-half months under suspicious circumstances; the newspaper account (see footnote 1); the homicide investigation; deposition testimony of Great Southern’s claims manager, Washburn, that Garelick told him in July that he felt Harris was either in FBI custody, or dead; and testimony by Garelick’s attorney that he discussed with Garelick the effect of the five year presumption of death statute, which, according to Great Southern, related to Harris’ death.

. Garelick’s attorney testified that the rescission of the policies was initiated by Great Southern. There was also testimony that Gar-elick was concerned about possible damage to his business reputation if his holding the policies on Harris’ life should be publicized, had stated that he wished he never had the policies, and was also concerned about protecting his business relationship with Great Southern. The attorney also denied that he and Garelick ever discussed the possibility that Harris was dead.